UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAVON DUSTIN MARSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-128-SPM |
| | ) | |
| | ) | |
| ROBERT A. RECKERT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Robert A. Reckert's Motion for Summary Judgment (ECF No. 38). The motion has been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 51). For the following reasons, the motion will be denied.

I.    **FACTUAL BACKGROUND**

This action arises from a use of force that occurred at the Eastern Reception Diagnostic and Correctional Center ("ERDCC") on February 7, 2022. On that date, Plaintiff Javon Marsh was an inmate incarcerated at ERDCC, and Defendant Robert Reckert was a Missouri Department of Corrections Sergeant working at ERDCC. Defendant's Statement of Uncontroverted Material Facts, ECF No. 40 ("DSUMF") ¶¶ 2-3. At around 6:40 p.m., officers conducted a search of Marsh's cell. *Id.* ¶ 4. As part of that search, Marsh was instructed to strip down to his underwear and shower shoes so that he could be examined for any contraband on his body. Plaintiff's Statement of Uncontroverted Material Facts, ECF No. 70 ("PSUMF") ¶ 7. In the search, officers found items in Marsh's cell that he says were trash but that officers considered contraband.

1

DSUMF ¶ 5, PSUMF ¶ 8. As a result of the search, Marsh was issued a conduct violation and was told he would be moving from Housing Unit Four to the administrative segregation unit in Housing Unit Two. DSUMF ¶¶ 6-10.

Reckert escorted Marsh to Housing Unit Two. DSUMF ¶ 11, PSUMF ¶ 11. Before the escort began, Marsh turned around with his back facing Reckert, placed his arms behind his back, and allowed Reckert to handcuff him. PSUMF ¶ 12. His arms were crossed, which significantly restricted his range of motion and mobility. *Id.* Reckert and Marsh were joined by Officer Michael Thompson. *Id.* ¶ 13. Marsh was still wearing only his underwear and open-toed shower shoes. *Id.* ¶ 18. The walk to Housing Unit Two from Housing Unit Four is at least a couple of minutes long and takes place outside, along a concrete path surrounded by grass. DSUMF ¶ 10, PSUMF ¶¶ 16-17. On the date in question, the weather was freezing, and the grass around the concrete path was covered in snow. PSUMF ¶ 18.

Marsh was feeling tense and angry as the escort began, and he was visibly upset. DSUMF ¶¶ 14, 17. However, Marsh never aggressed against any of the officers and never acted angrily toward any of the officers. PSUMF ¶ 30. During the escort, Marsh never resisted the officers, never threatened the officers, never pulled away from officers, never tried to pull away from officers, and never disobeyed any direct orders from officers. PSUMF ¶¶ 31-34.[1] Early in the escort, Marsh heard Reckert say, "Stop resisting!" *Id.* ¶ 19. Marsh testified that this was "an odd statement, because [h]e was not resisting at all . . ." and was "simply walking." *Id.*; Declaration of Javon

---

[1] In the officers' versions of events, Marsh repeatedly attempted to pull away from officers and continued to be noncompliant after officers gave him multiple verbal directives to stop trying to pull away. Marsh denied these claims both in his deposition testimony and in his Declaration. For purposes of the instant motion, the Court must view the evidence in the light most favorable to Marsh.

Marsh, ECF No. 69-1 ("Marsh Dec."), ¶ 19. Near the beginning of the escort, as Marsh passed by Captain Howe (an officer who was not part of the escort) Marsh attempted to speak to Captain Howe. DSUMF ¶¶ 18-20; Deposition of Javon Marsh, ECF No. 40-1 ("Marsh Dep.") 30:18-31:15, 77:4-16. When asked in his deposition whether this attempt "could reasonably have been mistaken as [Marsh] resisting," he responded, "Yes." Marsh Dep. 77:4-78:2. The record does not indicate what Marsh said or how he acted during the attempt to talk to Captain Howe, and no officers mention this attempt in their reports or elsewhere.

After the direction to stop resisting, Reckert suddenly slammed Marsh to the ground. PSUMF ¶¶ 19-20; Marsh Dec. ¶¶ 19-20. Marsh's shoulder forcefully hit the ground, causing extreme pain. PSUMF ¶ 20. A third officer (Wells) then appeared, pulled Marsh's dreadlocks, and shoved Marsh's face in a patch of dirt where snow had melted. *Id.* ¶ 21.

Marsh was then brought back to his feet and continued walking. *Id.* ¶ 22. As the walk continued, Reckert and Thompson told Marsh to comply with orders and said he was not walking. DSUMF ¶ 29. However, these were false accusations; Marsh was entirely compliant during the entire escort. Marsh Decl. ¶¶ 31-34; Marsh Dep. 42:4-6. Marsh heard Thompson say, "Don't grab my hand." DSUMF ¶ 28. This accusation was also false; Marsh was not grabbing Thompson's hand, and Marsh's own hands were handcuffed behind his back. PSUMF ¶ 24. Reckert and Thompson, assisted by another officer (Leyburn), then suddenly rushed Marsh off the path and slammed him in the snow again. *Id.* ¶ 25. Leyburn sprayed him with pepper spray. DSUMF ¶ 33. Marsh was again brought back to his feet and continued walking with officers to his cell in Housing Unit Two. *Id.* ¶ 34. Marsh was briefly assessed by medical staff shortly after the uses of force and was assessed again the next morning. *Id.* ¶¶ 42, 46; PSUMF ¶ 38.

3

As a result of Reckert's actions, Marsh was bleeding profusely, with multiple abrasions on his body. PSUMF ¶ 28. Marsh sustained multiple injuries to his shoulder, wrists, and ankle. *Id.* ¶ 27. He still has permanent scars on his body, of which he has submitted photographs (taken January 2, 2025) to the Court. *Id.* ¶ 29. As of January 2, 2025, he was still experiencing pain in his shoulder. *Id.* ¶ 43.

The grievance process at ERDCC consists of an informal resolution request ("IRR"), a grievance, and an appeal of denial of the grievance. Marsh Dep. 128:12-129:4. On February 22, 2022, Marsh submitted an IRR to ERDCC Corrections Case Manager II Timothy McFarland describing the allegations of excessive force on February 7th and naming Reckert and Wells. PSUMF ¶ 48; Marsh Dep. 125:7-10, 126:15-127:25. Marsh never saw the form again after he gave it to Mr. McFarland. PSUMF ¶ 48. He does not have a copy of this IRR. DSUMF ¶ 52. Marsh subsequently filed a grievance complaining that the February 22nd IRR had not been processed. PSUMF ¶ 49; Ex. 1 to Pl.'s Compl., ECF No. 1-3. In that grievance, Marsh stated that on March 11, 2022, Marsh asked Mr. McFarland about the IRR, Mr. McFarland said it was being processed and he would get Marsh a copy of it, but Mr. McFarland never did. Ex. 1 to Pl.'s Compl., ECF No. 1-3, at 2. That grievance was denied, as was Marsh's appeal. PSUMF ¶ 49.

Marsh filed suit in this Court on February 3, 2023. The only claim currently remaining is Marsh's claim that Reckert used excessive force against him, in violation of the Eighth Amendment. Reckert now moves for summary judgment on that claim.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the

initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Henderson v. State Farm Fire & Cas. Co.*, 113 F.4th 1042, 1050 (8th Cir. 2024) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012)). If the movant does so, "the nonmovant must then 'respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Gannon Int'l, Ltd.*, 684 F.3d at 792). The nonmovant "must provide more than conjecture and speculation." *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022).

A dispute about a material fact is genuine, making summary judgment inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

#### A. Failure to Exhaust Administrative Remedies

The Court first considers Reckert's argument that he is entitled to summary judgment because Marsh has failed to exhaust administrative remedies. Under the Prison Litigation Reform Act ("PLRA"), "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *See also Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) ("An inmate must exhaust all available

5

administrative remedies before bringing a § 1983 suit."). "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 211-12 (2007)).

To properly exhaust available administrative remedies, an inmate must "complete the administrative review process in accordance with the applicable procedural rules." *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Those rules "are defined not by the PLRA, but by the prison grievance process itself." *Id.* The PLRA's exhaustion requirement "hinges on the 'availab[ility]' of administrative remedies," and an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). "[A] remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under § 1997e(a)." *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001).

As discussed above, the grievance process at ERDCC consists of an informal resolution request ("IRR"), a grievance, and an appeal of the denial of the grievance. It is undisputed that Marsh did not complete this process with respect to his allegations of excessive force on February 7, 2022. Marsh testified that on February 22, 2022, he submitted an IRR to Timothy McFarland, a corrections case manager, describing the events of February 7, 2022, but then he never saw the forms again. Consistent with this testimony, Marsh subsequently submitted a grievance, then an appeal, complaining about the missing IRR and McFarland's failure to process it. Reckert has produced no evidence to suggest that Mr. McFarland was not an appropriate person for Marsh to submit the IRR to under the prison's grievance procedures, nor has Reckert offered any argument or evidence to suggest that there was any procedure Marsh should have followed, but did not follow, once he realized that his IRR had gone missing. It is unclear what more Marsh could have or should have done to attempt to exhaust his administrative remedies.

6

Under similar circumstances, courts have found that defendants have not established a failure to exhaust available administrative remedies. *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2011), is instructive. In *Foulk*, the prisoner plaintiff testified that he filed an IRR, that he never received a response to the IRR, and that he could not file a grievance because he never received a response to the IRR. *Id.* at 698. The Eighth Circuit found that this testimony "suggests that he had exhausted his administrative remedies because, once MDOC failed to respond to his IRR, no further administrative proceedings were 'available' to him." *Id.* The court found that under these circumstances, "the district court lacked a sufficient factual basis on which to find that [the plaintiff] did, in fact, fail to exhaust his administrative remedies" and properly declined to dismiss the prisoner's claims for failure to exhaust administrative remedies. *Id. See also Conner v. Doe*, 285 F. App'x 304 (8th Cir. 2008) (holding the district court erred in dismissing a prisoner's complaint for failure to exhaust administrative remedies based on jail personnel's declaration that there was no record of the plaintiff's having filed any grievance; stating, "[t]his evidence was insufficient to establish failure to exhaust in the face of [the plaintiff]'s assertion in his verified complaint that he had filed at least two relevant grievances but did not receive copies of them or responses to them"); *Nixon v. Sanders*, 243 F. App'x 197, 199 (8th Cir. 2007) (holding the district court erred in granting summary judgment based on failure to exhaust administrative remedies; finding prisoner plaintiff had raised a factual dispute about whether he was denied the necessary forms after requesting them from prison officials); *Miller v. Norris*, 247 F.3d 736, 738-740 (8th Cir. 2001) (finding prisoner's allegations that prison did not respond to his written requests for grievance forms were "sufficient to raise an inference that he had exhausted his 'available' remedies").

7

Here, as in the above cases, Marsh has provided evidence sufficient to show that he exhausted the administrative remedies that were "available" to him. If his testimony is credited, as it must be for purposes of summary judgment, he completed the first step of the grievance process by submitting an IRR, but prison officials prevented him from completing the process by not processing the IRR. He attempted to address the missing IRR through a separate grievance, to no avail. Reckert has not shown that there is anything more Marsh could have done to exhaust his administrative remedies.

For all of the above reasons, the Court finds Reckert is not entitled to summary judgment based on failure to exhaust administrative remedies.

## B. Marsh's Excessive Force Claim

### 1. Excessive Force Claims Under the Eighth Amendment

Once a prisoner is incarcerated, "only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (internal quotation marks omitted). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Peterson v. Heinen*, 89 F.4th 628, 635 (8th Cir. 2023) (quoting *Whitley*, 475 U.S. at 319). In assessing an Eighth Amendment excessive force claim, the "'core judicial inquiry' is whether the accused officers applied force 'in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson v. McMillan*, 503 U.S. 1, 7, (1992)). In conducting this inquiry, the Court considers "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and

'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). "[F]orce applied with 'a complete absence of a penological purpose' may raise 'the reasonable inference that the officers acted maliciously in an effort to cause harm.'" *Hageman v. Minnesota Dep't of Corr.*, No. 22-2098, 2023 WL 4760732, at *2 (8th Cir. July 26, 2023) (quoting *Williams v. Jackson*, 600 F.3d 1007, 1014 (8th Cir. 2010)).

Eighth Amendment claims involve "a different and less protective test" than the Fourth Amendment test of "whether an officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (internal quotation marks omitted). For purposes of the Eighth Amendment, "the subjective motivations of the individual officers are of central importance in deciding whether force was used maliciously and sadistically to cause harm in violation of the Eighth Amendment." *Id.* (internal quotation marks omitted).

### 2. *Qualified Immunity*

"'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A government official is "entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Aldridge v. City of St. Louis*, 75 F. 4th 895,

898 (8th Cir. 2023) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks omitted). In order for a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

    3.   *Whether Reckert Is Entitled to Summary Judgment on Marsh's Excessive Force Claim*

        a.   <u>Whether the facts, viewed in the light most favorable to Marsh, show a violation of Marsh's Eighth Amendment Rights</u>

Reckert's principal argument is that there was no Eighth Amendment violation in this case because the officers' version of events, as set forth in their reports, is undisputed. According to the officers' reports, Marsh repeatedly tried to pull away from officers during the escort, Marsh failed to comply with multiple directives to stop pulling away, and Reckert and other officers placed him on the ground in order to regain control over him. To support this argument, Reckert relies on deposition testimony in which, after the officers' reports were read, Marsh testified that he "agreed" with those reports. Def. SUMF, ¶ 21.[2]

The Court agrees that *if* it were undisputed that Marsh was pulling away or attempting to pull away from officers despite multiple verbal directives to stop, the evidence would not demonstrate a violation of the Eighth Amendment, and Reckert would be entitled to summary judgment. Under that set of facts, Reckert would have reasonably perceived that Marsh was trying

---

[2] Reckert also relies on his requests for admissions addressing these matters, which were initially deemed admitted when Marsh filed to timely respond to them. However, in a separate order, the Court granted Marsh's request to withdraw the deemed admissions. *See* ECF No. 86.

to escape from the escort and/or might pose a threat to the safety of officers or other inmates. Even if it was not strictly necessary for Reckert to slam Marsh to the ground, doing so would have been a good faith attempt to address the reasonably perceived threat and to restore order and discipline. *See Nettles v. Lombardi*, No. 1:13-CV-146 JAR, 2016 WL 4502501, at *5-*6 (E.D. Mo. Aug. 29, 2016) (granting summary judgment in favor of officer who took prisoner to the ground during an escort after the plaintiff had punched an officer and later disobeyed an officer's directive to stop walking so fast in front of an officer; reasoning that "Plaintiff himself makes critical admissions regarding the disorder he caused by punching an officer in the chest and disobeying directives"; also noting that an inmate escape from an escort poses a security risk for officers and inmates and finding that the officer used force only as necessary to address a reasonably perceived threat and restore discipline). *See also Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) ("[S]ummary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy.").

However, after review of Marsh's entire deposition, the Court finds that the key facts asserted in the officers' accounts are *not* undisputed. When Marsh was first read Wells' report, Marsh testified that he did not agree with Wells' description of events. Marsh Dep. 40:22-24. When asked what about the report was not accurate, he testified, "It says I pulled away from staff. They say I was noncompliant and I was—they say I attempted to pull away from staff, I never pulled away from staff." Marsh Dep. 41:15-19. He further testified that he never tried to pull away during the escort; that he was not non-compliant with orders at any time during the escort, and that he was entirely compliant during the entire escort. Marsh Dep. 41:22-42:6. He testified that he believed Wells was lying in the report. Marsh Dep. 42:7-9. Later, when asked to read a Use of Force Summary Report, Thompson's report, and (again) Wells' report, all of which were

substantially the same and all of which described his attempts to pull away and lack of compliance, Marsh testified that he agreed with each of the reports. Marsh 83:9-90:21. However, when specifically asked to confirm that he agreed with Thompson's and Wells' reports that he was non-compliant, he did not agree—he stated that he "was compliant." Marsh Dep. 91:8-22.

The ambiguity in Marsh's deposition was addressed in Marsh's post-deposition Declaration, in which he clarified that, consistent with much of his deposition testimony, at no point during the escort did he pull away from staff, attempt to pull away from staff, resist the officers, or disobey any direct orders, and that the officers falsely accused him of being non-compliant. Marsh Declaration, ECF No. 69-1, at ¶¶ 31-32, 34.[3] A jury certainly could, after hearing and weighing testimony from the officers and Marsh on these points, find the officers' version more credible; however, they could also find Marsh's version more credible. However, it is not the Court's role to make these credibility assessments at the summary judgment stage. *Coker v. Arkansas State Police*, 734 F.3d 838, 843 (8th Cir. 2013) ("[I]t is not [the court's] function to remove the credibility assessment from the jury.").

In the alternative, Reckert argues that even there are disputes about whether Marsh was attempting to pull away from officers and disobeying their verbal directives during the escort, it is undisputed that Reckert reasonably believed that Marsh was "resisting" the escort when he used force, and thus that the use of force was in a good-faith effort to maintain or restore discipline. To support this argument, Reckert argues that (1) Marsh admitted he was hostile and visibly upset,

---

[3] Reckert moved to exclude several relevant portions of Marsh's Declaration, arguing that they violated the sham affidavit rule. The Court addressed that motion in a separate order and denied Reckert's requests as to most of the portions of the Declaration at issue. *See* ECF No. 87. However, even without the benefit of the Declaration, the Court would find Marsh's ambiguous and confusing deposition testimony insufficient to show that he does not dispute the officers' account of events.

and (2) Marsh admitted in his deposition that his attempt to talk to Captain Howe early in the escort "could have reasonably been mistaken as [Marsh] resisting." Marsh Dep. 77:4-78:3.

Although Marsh admitted in his deposition that officers could have reasonably thought he was "resisting" (whatever that meant to Marsh) when he tried to talk to Captain Howe shortly before the first use of force, that admission is not dispositive of whether force was permissible under the Eighth Amendment. Under Eighth Circuit law, "[n]ot every instance of inmate resistance justifies the use of force . . . ." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002). It is "clearly established that force may be justified to make an inmate comply with a lawful prison regulation or order, but *only if the inmate's noncompliance also poses a threat to other persons or to prison security*." *Id.* at 872, 875 (emphasis added) (holding inmate's repeated refusal to take his copy of a form when a prison official demanded he do so did not justify one officer's decision to use pepper spray or a second officer's decision to throw him to the ground; noting that the law "recognizes that order and discipline are important in running a correctional institution" but finding that does not "justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns"). *See also Hickey*, 12 F.3d at 759 (noting that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy" but finding use of stun gun against a noncompliant inmate, absent any perceived threat to safety or security, violated the Eighth Amendment).

Thus, even assuming that Reckert could have mistakenly believed Marsh was upset and was "resisting" in some sense, the use of force was only permissible if the evidence shows that this "resistance" might have been perceived as posing a threat to prison security or order or a risk to the safety of inmates or officers. The record contains no such evidence. The record contains no evidence of what Marsh said or tried to say to Captain Howe; no evidence that Marsh

13

communicated to Captain Howe any intent not to fully comply with the escort (as he was doing and had been doing); no evidence that Marsh ever stopped walking forward, slowed his walking speed, moved his body, or even turned his body when he tried to talk to Captain Howe; no evidence that officers ever told Marsh to stop talking to Captain Howe; no evidence that Marsh continued to attempt to talk to Captain Howe after being told not to do so or after being told to keep walking; and no evidence that Marsh's attempt to talk to Captain Howe played any role in any officer's decision to use force.[4]

The Court emphasizes that for purposes of summary judgment, it must view the facts in the light most favorable to Marsh and must avoid drawing inferences in favor of Reckert. *See Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006) (reversing district court's grant of summary judgment on Eighth Amendment excessive force claim where the district court improperly drew inferences in the defendants' favor to find their actions were done in "good faith";

---

[4] Reckert attempts to supply some of these missing facts in his Reply brief, but Reckert's assertions do not appear to be supported by the record. Reckert states, "Plaintiff's admission that he did not simply continue walking toward his new housing unit during the escorted transfer—but instead attempted to turn toward one of the officers and debate whether he should be going to administrative segregation—dooms his case." Reply, ECF No. 77, at 2. Reckert cites no facts in the record to indicate that Marsh turned toward any officer or tried to debate anything with any officer, and the Court's review of the record reveals none. Reckert's implication that Marsh did not continue walking during this attempt is also unsupported by the record.

Reckert later states that Marsh "was attempting to talk to Captain Howe during his escort despite repeated verbal directives to keep walking," and that "[a] reasonable correctional officer in Defendant's position would understand Plaintiff was not complying with the directive that he keep walking. And even Plaintiff conceded that he cannot contradict Defendant's testimony that this is what he believed." Reply, ECF No. 77, at 6. Again, the Court does not find support in the record for these statements. Even assuming that Marsh's attempt to talk to Captain Howe could be perceived as noncompliance with a verbal directive to keep walking, there is no evidence that Marsh continued to attempt talk to Captain Howe *after* a verbal directive to keep walking, as Reckert implies. Finally, although Reckert mentions his "testimony that this is what he believed," the record contains no "testimony" from Reckert, and Reckert's report does not mention any attempt to talk to Captain Howe or any beliefs Reckert formed based on Marsh's attempt to talk to Captain Howe. *See* Reckert Incident Report, Pl.'s Ex. B, ECF No. 70-2 at 1-2.

14

stating, "Particularly when considering such fact specific issues, it is important that a court adhere to the summary judgment standard, which requires that the court 'view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party'") (internal citations and quotation marks omitted). Applying that standard here, Marsh was tense, angry, and visibly upset, but he never acted angrily toward officers, was fully compliant with the escort, was not trying to pull away from officers, and was not disobeying any direct orders from officers. He was in handcuffs, with his hands behind his back, and was wearing only his underwear and shower shoes outside in freezing weather. While passing by an officer, he tried to speak to the officer, at which point Reckert told him to "stop resisting" and—apparently without giving him a chance to comply—slammed him to the ground hard enough to cause extreme pain. Officers then brought Marsh to a standing position, walked a bit more, falsely accused him of not complying and/or not walking, and falsely accused him of grabbing Thompson's hand, at which point Reckert and other officers suddenly slammed him to the ground again, leaving him bleeding, with scarring and pain that persist nearly three years later.

In assessing whether Reckert's actions violated the Eighth Amendment, the Court finds *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002), instructive. In *Treats,* prison officials summoned the plaintiff to an office to sign a form acknowledging a radio had been confiscated from his cell. 308 F.3d at 870. The plaintiff signed the form, stated he did not want a copy, and left. *Id.* An officer twice demanded the plaintiff take a copy of the form, but the plaintiff continued to state that he did not want a copy. *Id.* The plaintiff turned to go back to the office to talk to a second officer about the issue. *Id.* Without warning, the first officer sprayed him in the face with pepper spray, and the second officer ran out of the office and slammed the plaintiff to the floor, where he was handcuffed. *Id.* The officers cited evidence that plaintiff had used abusive language

to staff, had failed to obey a verbal order, and had resisted being handcuffed after being sprayed, arguing that this showed he was recalcitrant. *Id.* at 874. The plaintiff, however, testified that he did not intentionally disobey an officer, use profanity or abusive language, or threaten any correctional officer, and that he was sprayed without warning. *Id.* at 872. Viewing the evidence in the light most favorable to the plaintiff, the Eighth Circuit found that there was no objective need for the degree of force used or the pain inflicted, that the defendants could not reasonably have perceived the plaintiff as a threat to themselves or institutional security at the time, and that the defendants failed to temper their forceful response. *Id.* at 874. Although there was no lasting injury, the court found no lasting injury was necessary for an Eighth Amendment claim. *Id.* The court found "sufficient evidence for a reasonable jury to conclude that appellants acted maliciously with the intent to cause injury when [the first officer] sprayed him with capstun pepper spray without warning and [the second officer] threw him down." *Id.* The Eighth Circuit also found the right was clearly established at the time, stating, that it is "clearly established that force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security" and that "the law was clearly established that correctional officers do not have a blank check to use force whenever a prisoner is being difficult." *Id.* at 875.

Here, like the inmate in *Treats*, Marsh was attempting to talk to an officer, and was doing so under circumstances that might reasonably have been perceived as Marsh being resistant and difficult.[5] As in *Treats*, however, the evidence (viewed in the light most favorable to Marsh) does not suggest that Marsh—who was handcuffed and complying with officer orders at the time—

---

[5] Indeed, the instant case involves even less evidence of resistance than *Treats*, in which the plaintiff acknowledged he did not do what an officer repeatedly demanded that he do.

16

posed any threat to institutional security or order or to officer or inmate safety simply based on his attempt to talk to Captain Howe. The type of force used here—slamming Marsh to the ground— was the same as the type of force used by one of the officers in *Treats*. Also as in *Treats*, Reckert did not temper his forceful response, for example by telling Marsh to stop talking to Captain Howe and giving him a chance to comply before using force. Finally, Plaintiff's bleeding and long-lasting pain and scarring shows that his injuries were more severe than those in *Treats*.

In sum, as in *Treats*, a reasonable juror could find that Reckert twice slammed Marsh to the ground, without warning, hard enough to cause bleeding and lasting pain and scarring, merely because Marsh was angry and attempted to speak to an officer who was not part of the escort, while Marsh was still complying with the escort, and absent any reason to think Marsh posed a threat to prison security or order or to inmate or officer safety. This is sufficient to support an inference that the uses of force were not attempts to restore discipline, but rather were malicious and sadistic, and that Reckert violated Marsh's Eighth Amendment rights. *See Treats*, 308 F.3d at 875. *See also Hickey*, 12 F.3d at 759 (8th Cir. 1993) (noting that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy" but finding use of stun gun against an inmate who refused to obey a housekeeping order, absent any threat to safety or security, violated the Eighth Amendment); *Hageman*, 2023 WL 4760732, at *2 ("[F]orce applied with 'a complete absence of a penological purpose' may raise 'the reasonable inference that the officers acted maliciously in an effort to cause harm.'") (quoting *Williams*, 600 F.3d at 1014 (8th Cir. 2010)).

In his reply brief, Reckert offers a new argument to justify the use of force, stating, "the undisputed evidence further shows that, immediately prior to Plaintiff being placed on the ground, other officers commented that Plaintiff was 'resisting' and told Plaintiff he needed to stop grabbing

17

their hands"; that "there is no evidence that Defendant had any reason to believe otherwise"; and that "Defendant has testified that he did, in fact, believe Plaintiff was resisting under these circumstances." Def. Reply, ECF No. 77, at 4. It is unclear whether the Court should consider this argument, which was raised for the first time in Reckert's reply brief. *See Green v. Missouri*, 734 F. Supp. 2d 814, 848 (E.D. Mo. 2010), *aff'd sub nom. Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012) ("As a general rule, courts will not consider arguments raised for the first time in a reply.") (citing *Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006)). Additionally, with respect to this argument, Reckert does not "identify those portions of the record" that he believes demonstrate the absence of a genuine issue of material fact, which is his responsibility in moving for summary judgment. *See Henderson v. State Farm Fire & Cas. Co.*, 113 F.4th at 1050. Although Reckert's statement of facts indicates that Marsh heard Thompson tell Marsh to stop grabbing his hand immediately before the second use of force, it is not apparent from either party's statement of facts that officers (other than Reckert) commented that Marsh was "resisting" immediately before either use of force. Additionally, although Reckert suggests that he "testified that he did, in fact, believe Plaintiff was resisting under these circumstances." the record contains no testimony from Reckert, and no statements from Reckert indicating that he formed any beliefs based on other officers' statements.

Even if the Court considers this argument, made for the first time in a reply brief with very questionable factual support, Reckert has not established an absence of genuine issues of material fact concerning whether Reckert could reasonably have believed Marsh posed a threat to prison order or safety prior to either use of force. Viewing the facts in the light most favorable to Marsh, both Reckert and the other officers were falsely accusing Marsh of noncompliance throughout the escort, despite the fact that he was fully compliant. Additionally, because Reckert was personally

escorting Marsh, it could reasonably be inferred that Reckert was in a position to see that Marsh was—contrary to other officers' comments—not resisting the escort and not grabbing anyone's hand. Thus, even if Reckert heard the other officer comments he describes (which is unclear), a reasonable juror could find that Reckert could not reasonably have believed that Marsh was resisting or grabbing anyone's hand based on the other officers' comments, but rather knew that the officers were falsely accusing Marsh of noncompliance as a pretext for the use of force throughout the escort. If those factual issues are resolved in Marsh's favor, a reasonable juror could conclude that Reckert had no reason to believe Marsh was doing anything that might threaten prison security or order or inmate or officer safety, and that his decision to slam Marsh to the ground hard enough to cause pain, pleading, and scarring was done maliciously and sadistically with intent to harm, not in a good-faith effort to restore order or discipline.

For all of the above reasons, the Court finds that the facts, viewed in the light most favorable to Marsh, show that Reckert violated Marsh's Eighth Amendment rights. It is certainly possible that a jury may weigh the credibility of the various accounts and resolve the disputed issues of fact in the officers' favor, but that is not the role of the Court at this stage.

b.  <u>Whether the right was clearly established at the time of the violation</u>

Turning to the second prong of the qualified immunity analysis, the Court considers whether the right at issue was clearly established as of February 7, 2022, such that a reasonable officer would have understood that his actions were unlawful. As discussed above, a finding that a right is clearly established does not require a case directly on point if "existing precedent . . . placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The Eighth Circuit stated in 2002 that it was "clearly established that force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance

also poses a threat to other persons or to prison security." *Treats*, 308 F.3d at 875. In the same case, the Eighth Circuit also found that that it was "clearly established that correctional officers do not have a blank check to use force whenever a prisoner is being difficult." *Id.* As discussed at length above, the factual context in which the Eighth Circuit made the statements in *Treats* was analogous to the factual scenario in this case, at least when the facts are viewed in the light most favorable to Marsh. The Court concludes the contours of the right at issue are sufficiently established that any reasonable official would have known that Reckert's decision to slam a fully compliant inmate to the ground without warning, hard enough to cause bleeding and permanent pain and scarring, after he attempted to talk to another officer but absent any facts to suggest that the inmate posed a risk to prison security or order or to officer or inmate safety, violated his Eighth Amendment rights. Thus, Reckert is not entitled to summary judgment on the second prong of the qualified immunity analysis.

## IV.    CONCLUSION

For the above reasons, the Court finds that there are genuine issues of material fact that preclude summary judgment on Marsh's excessive force claim. Accordingly,

**IT IS HEREBY ORDERED** that Defendant Robert A. Reckert's Motion for Summary Judgment (ECF No. 38) is **DENIED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of March, 2025.