# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| JAVON DUSTIN MARSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-00128-SPM |
| | ) | |
| ROBERT A. RECKERT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court following an evidentiary hearing on the question of whether Plaintiff Javon Marsh failed to exhaust his available administrative remedies before filing the instant action, as required by the Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a) (the "PLRA"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). ECF No. 51. As set forth below, I find that Marsh has not exhausted his available administrative remedies as to the claim before the Court in this action, and thus his claim must be dismissed.

**I.  BACKGROUND**

This action arises from a use of force that occurred at the Eastern Reception Diagnostic and Correctional Center ("ERDCC") on February 7, 2022. On that date, Plaintiff Javon Marsh was an inmate incarcerated at ERDCC, and Defendant Robert Reckert was a Missouri Department of Corrections Sergeant working at ERDCC. Marsh asserts that while Reckert was escorting Marsh from one housing unit to another, Reckert twice slammed Marsh to the ground without justification, causing Marsh lasting pain and injuries. Marsh asserts an excessive force claim

against Reckert pursuant to 42 U.S.C. § 1983.[1] Reckert moved for summary judgment on multiple grounds, including the affirmative defense of failure to exhaust administrative remedies. I denied that motion, finding genuine issues of material fact regarding whether Marsh had exhausted the administrative remedies that were available to him.

I held an evidentiary hearing to address the question of exhaustion of administrative remedies on August 22, 2025. At the hearing, Reckert presented testimony and documentary evidence to support his position that Marsh did not exhaust available administrative remedies in accordance with ERDCC grievance procedures. Marsh presented testimony and documentary evidence to support his position that he attempted to do so but that that his efforts were thwarted by ERDCC staff.

## II. LEGAL STANDARDS

Under the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To properly exhaust available administrative remedies, an inmate must "complete the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Those rules "are defined not by the PLRA, but by the prison grievance process itself." *Id.* The benefits of exhaustion include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Id.* at 219. *See also Woodford*, 548 U.S. at 89-91 ("The PLRA attempts to eliminate

---

[1] Marsh also asserted other claims, but those have been dismissed.

2

unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.") (citation modified).

The PLRA's exhaustion requirement "hinges on the availability of administrative remedies," and an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citation modified). "An inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of." *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "The Supreme Court recognizes at least three circumstances where an administrative remedy is 'not capable of use' and thus unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide *any* relief to aggrieved inmates,' (2) where the 'administrative scheme' is 'so opaque' as to be practically 'incapable of use,' and (3) where 'administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Muhammed v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (quoting *Ross*, 578 U.S. at 643-44; internal citations omitted). *See also Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) (prisoners need not comply with grievance procedures to for purposes of the exhaustion requirement "when officials have prevented prisoners from utilizing the procedures" or "when officials themselves have failed to comply with the grievance procedures"); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under § 1997e(a).").

"Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing *Jones*, 549 U.S. at 211-12). *See also Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir. 2001) ("[T]he

3

assertion that a plaintiff prisoner failed to exhaust all available administrative remedies as required under the PLRA is an affirmative defense under Fed. R. Civ. P. 8(c). It is the burden of the defendant asserting this affirmative defense to plead and prove it.").

"There is no question that exhaustion is mandatory under [the PLRA] and that unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 211. *See also Porter*, 781 F.3d at 451 ("An inmate must exhaust all available administrative remedies before bringing a § 1983 suit."). If the Court determines that claims are unexhausted, they must be dismissed without prejudice. *Id.* at 452.

### III. EVIDENCE PRESENTED AT THE HEARING

#### A. The ERDCC Grievance Process

Inmates at ERDCC were given an Offender Rulebook (the "Rulebook") that sets forth a three-step offender grievance procedure. Def. Ex. 20, at 66-70. The Rulebook states that inmates "are required to complete [this procedure] prior to filing a lawsuit in the federal courts." *Id*. at 66. The first step of this procedure is the filing of an Informal Resolution Request ("IRR"):

> **1. INFORMAL RESOLUTION REQUEST (IRR)**: If you have not been able to resolve your complaint, you may request an IRR form from unit staff. You must file this form within 15 calendar days of the incident you are complaining about. You are to receive a response within 40 calendar days of receipt of your IRR by the staff processing IRRs. If you have not received a response within that timeframe, you may proceed to the grievance stage, by notifying IRR staff and requesting an offender grievance form.

*Id.* at 66-67. The second step, if the inmate is not satisfied with the response to the IRR, is to file an offender grievance form within 7 calendar days of the date the inmate signs the IRR response. *Id.* at 67-68. The third step is to file an offender appeal form within 7 calendar days of the date the inmate signs the offender grievance response. *Id.* at 68.

4

### B. Marsh's Testimony

Marsh testified as follows. He received the Rulebook describing the grievance procedure when he became incarcerated at ERDCC. Prior to the incident at issue in this case, Marsh used this procedure to file IRRs related to other incidents and received responses.

While Marsh was in administrative segregation after the alleged February 7, 2022, excessive force incident, he asked for an IRR form from a mental health nurse who was doing rounds. A case manager, Timothy McFarland, brought him an IRR form on February 18, 2025. Marsh filled out the IRR form, describing his excessive force complaint against Reckert and other officers (the "excessive force IRR"). On February 22, 2022, he gave the IRR to McFarland. At first, McFarland gave the form back to Marsh and said he was not going to turn it in. After Marsh insisted, McFarland took the form. On multiple occasions over the next few weeks, Marsh spoke to McFarland about the IRR form. The last time was on March 17, 2022, when Marsh asked McFarland for a copy of the IRR form and a tracking number. McFarland told Marsh it was being processed and they were going to have a discussion. Marsh never received a response to the excessive force IRR and never had a formal discussion with McFarland or any other prison official about the excessive force IRR.

Marsh's understanding of the process was that if he did not receive a response to his IRR within 40 business days, he should file another IRR for a due process violation, stating that he had never received a response or had a discussion. Marsh testified that he did not file a grievance form about the excessive force claim because the grievance officer will not give an inmate a grievance form without a tracking number. Marsh also testified that he did not file a new IRR about the excessive force claim because a case worker had told him, in discussing a similar situation involving a missing excessive force IRR in January 2021, that he could not file an IRR more than

5

15 business days after the violation.

Marsh asked a case worker for an IRR form so he could file an IRR for a due process violation. On April 29, 2025, Marsh filed a second IRR (the "due process IRR"), claiming that his due process rights were violated when McFarland failed to document his earlier IRR. Def.'s Ex. 1. In the due process IRR, he stated that on February 22, 2022, at approximately 1:35 p.m., he turned in an IRR form to McFarland; that he asked McFarland about the IRR on March 11, 2022; that McFarland stated that it was being processed and McFarland would get Marsh a copy of it; and that Marsh never saw the IRR form again. *Id.* In the due process IRR, Marsh does not mention excessive force, Reckert, or any of the events of February 7, 2022. Marsh received a response denying the due process IRR. Def's Ex. 2. The response stated, "I have investigated the issue and reviewed written statements from staff. Through review, I do not see any IRRs that were filed while you were assigned to Housing Unit #2. Additionally, the staff member in question no longer works at ERDCC. . . . Based on the review of the findings, I do not find sufficient evidence to support your claim. Therefore, the IRR is denied." *Id.* Marsh then filed a grievance form addressing the due process issue; that grievance form also did not mention the subject matter of the excessive force IRR. Def.'s Ex. 3. The grievance was denied on the grounds that the IRR response had adequately addressed the complaint, that McFarland was no longer employed at ERDCC, that Marsh had failed to provide sufficient evidence to support his claim, and that Marsh "failed to file [his IRR] within fifteen working days of the alleged incident." Def's Ex. 4. Marsh then filed a grievance appeal for the due process claim. Def's Ex. 5. The appeal mentioned that "numerous violations took place on Feb 7, 2022 at 6:30 pm," but it did not describe the nature of the alleged violations and did not mention excessive force or Reckert. *Id.* The appeal was denied on the grounds that here was no way to verify the allegation because McFarland was no longer employed

6

with the Department of Corrections and that the grievance management system showed no submitted complaints for the month of February 2022 . Def.'s Ex. 6.

### C. McFarland's Testimony

Timothy McFarland, a case manager at ERDCC in February of 2022, testified as follows. McFarland's job duties included doing rounds in the housing units and handling IRRs and grievances. Part of his job was providing IRR forms to inmates in administrative segregation. To file an IRR, the inmate asks the case manager for an IRR during rounds, and then the case manager hands the inmate the IRR form. The inmate gives the case manager the completed IRR form, and the case manager enters it into the computer system. After the IRR is initially submitted, the case manager who received the IRR has a discussion with the inmate to attempt to resolve the issue. If the discussion does not resolve the issue, the case manager gets responses from staff members named in the IRR, comes up with a response to the IRR, and has a unit manager look it over. An inmate is supposed to receive a response to the IRR within 40 days. If the inmate does not receive a response, he can ask unit staff to go on to the next stage or write to the grievance officer to ask to go to the next stage. He does not need an IRR response to continue on. McFarland later testified that if an inmate told him he had given an IRR to another case manager and it never got filed, and it had been more than 40 days, he would talk to the unit manager and grievance officer to see how to proceed. He testified that he could still give the inmate an IRR as long as it was not too far past the time frame, or that if it was too far, the inmate could write their grievance officer or the unit manager to request one. He also testified that he would tell an inmate to file both an IRR for the original complaint and an IRR for a due process violation related to failure to process the original IRR. He did not know if all case managers would agree. McFarland also testified that the 15-day time limit for filing an IRR may be waived by the grievance officer or the warden.

7

McFarland did not specifically remember Marsh or any of Marsh's allegations against him. He testified that he has never purposely destroyed an IRR or intentionally not turned in an IRR, and he would never do so. He does not recall ever having mistakenly not turned in an IRR. He believes that every time he received an IRR from an inmate, he immediately put it into the system.

### IV. DISCUSSION

After carefully considering the documentary and testimonial evidence submitted by the parties, I find that Reckert has carried his burden of proving, by a preponderance of the evidence, that Marsh did not exhaust the administrative remedies that were available to him with regard to his allegations of the use of excessive force on February 7, 2022. It is undisputed that Marsh did not exhaust the full three-step ERDCC grievance procedure with regard to the February 2022 excessive force incident. Thus, I will focus on whether that three-step procedure was "available" to Marsh.

Reckert has proven that as a general matter, the ERDCC had a grievance procedure that was available to its inmates, including Marsh. The uncontroverted testimony demonstrates that ERDCC inmates were given a copy of the Rulebook, which described the full three-step grievance process. Marsh acknowledged that he received a copy of the Rulebook well before the relevant time frame. He also acknowledged that he used the grievance process described and received responses on several occasions, both before and after the excessive force incident at issue here. There is no evidence to suggest either that this procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates" or that it is "so opaque as to be practically incapable of use." *See Muhammed*, 933 F.3d at 1000.

Marsh contends that the full ERDCC grievance process was not available to him because

8

McFarland's failure to comply with the procedure prevented Marsh from completing that procedure. *See Muhammed*, 933 F.3d at 1000 (a process is not available "where administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"); *Gibson*, 431 F.3d at 341 (inmates may be excused from compliance with procedures "when officials have prevented prisoners from utilizing the procedures," or "when officials themselves have failed to comply with the grievance procedures"). Marsh contends that he properly submitted an IRR to McFarland about the excessive force claim, thereby completing his part of the first step of the grievance process. He argues that when McFarland either destroyed or failed to process that IRR, Marsh was prevented from pursuing the subsequent steps of the ERDCC grievance process.

Based on the conflicting testimony presented at the hearing, it is unclear to whether Marsh ever, in fact, submitted an excessive force IRR to McFarland. I do not find either witness's testimony entirely credible. However, even if I fully credit Marsh's testimony that he submitted an IRR to McFarland, who then destroyed or failed to process it, I find that McFarland's conduct did not prevent Marsh from proceeding to the next step of the ERDCC administrative remedies procedure.

The Rulebook, which Marsh acknowledges he had, sets out a specific procedure that an inmate may follow when he files an IRR and does not receive a response within 40 calendar days: the inmate "may proceed to the grievance stage, by notifying IRR staff and requesting an offender grievance form." Def. Ex. 20, at 67. As of April 3, 2022, 40 calendar days had passed since the initial IRR, with no response. However, Marsh took no steps to attempt to follow the Rulebook's procedure. There is no evidence that Marsh ever notified IRR staff of the missing IRR after the 40 days had passed or requested an offender grievance form. There is also no evidence that Marsh

attempted to request or file a grievance form and was prevented from doing so.

The evidence that this procedure existed distinguishes this case from *Foulk v. Charrier*, in which the Eighth Circuit found no failure to exhaust available administrative remedies where, like Marsh, the plaintiff testified that he could not file a grievance form because he never received a response to his IRR. 262 F.3d 687, 698 (8th Cir. 2001).[2] In that case, the Eighth Circuit noted that the defendant "point[ed] to no evidence in the trial record which establishes that [the plaintiff] could indeed have filed a grievance despite MDOC's failure to respond to his IRR."  Here, in contrast, Reckert has pointed to such evidence.

Additionally, the fact that Marsh made no attempt to use this procedure distinguishes this case from *Miller v. Norris*, in which the Eighth Circuit found an inference had been raised that an inmate had exhausted his available administrative remedies where he alleged that he wrote to the Arkansas Department of Corrections requesting grievance forms but received no response, his mother also attempted to obtain the forms without success, and he filed a motion to compel in a civil action requesting that he be provided with the forms. *See* 247 F.3d 736, 738, 740 (8th Cir. 2001). Here, there is no evidence that Marsh ever made any attempt to request an offender grievance form.

Marsh testified that he did not proceed to the grievance stage because grievance officers will not give inmates grievance forms without a tracking number, which he did not have. However, it is unclear what the basis was for this belief. There is no evidence that Marsh ever requested a grievance form and was denied because he did not have a tracking number—either for the

---

[2] I relied on *Foulk* in denying Reckert's motion for summary judgment on failure to exhaust administrative remedies. *See* ECF No. 88, at 7. At that stage, Reckert did not present any evidence that there was a procedure in the Rulebook that a prisoner could follow if he did not receive a response to an IRR.

excessive force complaint at issue in this case or any prior complaint. The Rulebook also does not indicate that a tracking number is required to obtain a grievance form. Marsh's subjective belief that he could not proceed to the grievance form stage without a tracking number is not sufficient to show that this remedy was unavailable to him. *See Gibson*, 431 F.3d at 341 (rejecting the argument that grievance procedures set forth in a handbook were unavailable to the plaintiffs "because unnamed prison and healthcare personnel had 'made it clear' to them that they should voice all complaints regarding medical care informally to medical personnel" and they had a reasonable belief that medical grievances should be directed to the medical providers informally; stating, "an inmate's subjective belief that the procedures were not applicable to medical grievances does not matter and is not determinative" and noting that the plaintiffs "presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances") (internal quotation marks omitted); *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002) ("It does not matter . . . that [the plaintiff] may have subjectively believed that there was no point in his pursuing administrative remedies . . . § 1997e(a) does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures are 'available.'").

In the alternative, even if I accept Marsh's belief that the appropriate procedure when an inmate receives no response to an IRR is to file a due process IRR (rather than a grievance form), I find that the due process IRR Marsh filed on April 29th did not exhaust his administrative remedies as to the excessive force claim. As discussed above, the exhaustion requirement is intended to allow a prison to address complaints internally before the complaints can be brought to federal court. However, Marsh's due process IRR did not mention the allegations of excessive force or any of the February 7th events that gave rise to the claim currently before this Court.

11

Instead, his only complaint was about *McFarland's conduct on February 22nd*—the failure to process an IRR on an unspecified subject. This IRR gave ERDCC officials no opportunity to address the claim of excessive force that is currently before this Court and thus did not serve the purpose of the exhaustion requirement.[3] *See Jones*, 549 U.S. at 219; *Woodford*, 548 U.S. at 93. Moreover, as the grievance officer found in denying the due process claim raised in this IRR, the due process IRR was not timely filed because it was not filed within fifteen days of the alleged incident. Marsh knew of McFarland's violation of his due process rights by April 3, 2022, when 40 days with no response had passed. However, Marsh did not file the due process IRR until 26 days later, on April 29, 2022. An untimely grievance does not satisfy the exhaustion requirement. *See Woodford*, 548 U.S. at 83-84 (holding that a prisoner cannot satisfy the PLRA's exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal"). Marsh's late-filed due process IRR, which did not even mention excessive force, could not have exhausted Marsh's administrative remedies with respect to his excessive force claim.

In sum, I find that this was not a situation in which prison officials thwarted Marsh from taking advantage of the ERDCC grievance procedure. Even assuming that McFarland failed to comply with the first step of the procedure by failing or refusing to process the initial excessive force IRR, ERDCC procedures allowed Marsh to proceed to the next step of the grievance process. Marsh made no attempt to do so and made no other attempt to exhaust his administrative remedies with respect to the excessive force claim. I conclude, by a preponderance of the evidence, that

---

[3] Notably, Marsh also made no attempt to file a separate, second IRR addressing the excessive force allegations, which Reckert testified he would have advised an inmate in Marsh's position to do (in addition to filing the due process IRR).

12

Marsh did not exhaust the administrative remedies that were available to him with regard to the February 2022 excessive force incident. Accordingly, the Court must dismiss his claims.

V. **CONCLUSION**

**IT IS HEREBY ORDERED** that Marsh's excessive force claim is **DISMISSED**, without prejudice. A separate Order of Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the jury trial setting on **September 29, 2025**, and all accompanying deadlines, are **VACATED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of August, 2025.